THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

W.S., M.S., and C.S.,

                         Plaintiffs,

     v.

EDMONDS SCHOOL DISTRICT, a
Washington municipal corporation,

                     Defendant.

CASE NO. C21-0390-JCC

ORDER

This matter comes before the Court on the parties' cross motions for summary judgment on Plaintiffs' appeal of an Administrate Law Judge's ("ALJ") order under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C § 1400 *et seq.* (Dkt. Nos. 35, 39). Having thoroughly considered the parties' briefing and the relevant record, the Court GRANTS summary judgment to Defendant, DENIES Plaintiffs' motion, and AFFIRMS the ALJ's order.

I.      **BACKGROUND**

     A.     **C.S.'s Enrollment in the Edmonds School District**

Plaintiffs are C.S., the student, and his parents, W.S. and M.S. ("Parents"). (Dkt. No. 1 at 3.) C.S. completed ninth and tenth grade at Edmonds-Woodway High School during the 2016–2017 and 2017–2018 school years. (Dkt. No. 32 at 195.) He attended general education classes and a special education course called Academic Lab. (*Id.* at 195–96.) In March 2017, the Edmonds

School District ("the District") completed C.S.'s triennial reevaluation. (*Id.*) His diagnoses were attention deficit hyperactivity disorder, depression, and level 1 autism spectrum disorder. (*Id.*) The team recommended an Individualized Education Program ("IEP") with a goal related to learning strategies and organizational skills. (*Id.*)

In March 2018, C.S.'s IEP team met to review his annual IEP. (Dkt. No. 32 at 195.) C.S., his mother, and his general and special education teachers participated in the meeting. (Dkt. No. 30 at 72.) His teachers reported that he was distracted easily and struggled with submitting assignments. (*Id.* at 79.) The IEP included a goal to improve his rate of missing assignments and accommodations to reduce distractibility. (*Id.* at 83–84.) His mother proposed a system to help C.S. track assignments. (Dkt. Nos. 18 at 148, 19 at 110–11.) After the meeting, C.S. continued to attend classes but received a few disciplinary referrals. (Dkt. Nos. 30 at 50, 69–71, 21 at 19–20.)

On May 8, 2018, there was an incident in a school bathroom where another student took an airsoft gun from his backpack and pointed it at C.S. (Dkt. No. 21 at 26–28.) School administrators learned about this later that afternoon and spoke to the students involved. (*Id.*) C.S. stated that he and his friends were going off campus for lunch but stopped in the bathroom first where one of them told him "I wanna show you something" and displayed an "airsoft or pellet gun." (Dkt. No. 30 at 66.) The student who brought the weapon was expelled. (*Id.* at 60.)

Later that day, C.S. attended his monthly appointment at the Autism Center at Seattle Children's Hospital. (Dkt. No. 32 at 196.) At his appointment, he reported stressors at home and worsening depression; the hospital admitted him to their Pediatric Behavioral Medicine Unit for one week. (Dkt. Nos. 25 at 153, 32 at 196.)

After C.S.'s discharge, Parents met with District staff to discuss his return to school. (Dkt. No. 23 at 106; 52–54.) They signed a consent form for the District to conduct an "assessment revision" of his IEP to take his hospitalization into account. (Dkt. Nos. 23 at 110, 18 at 171–72.) He returned to school two days later and continued to attend partial days per his return plan through the end of the year. (Dkt. Nos. 15 at 93–94, 25 at 190–91, 30 at 93–94.)

1   On May 31, 2018, after the assessment revision, the IEP team met to discuss its results,

2   and the team added counseling with a District behavioral specialist as a support service to his

3   IEP. (Dkt. Nos. 20 at 14; 23 at 102, 109.) Parents reported concerns about bullying at the

4   meeting, too. (Dkt. No. 30 at 54.) The team discussed a temporary safety plan for C.S. that

5   allowed him to leave early so the Assistant Principal could escort him to his next class. (*Id.* at

6   43.) C.S.'s case manager sent an amended IEP to Parents, who agreed in writing to proceed

7   without reconvening the IEP team. (Dkt. No. 23 at 112–13.) Parents did not request that any

8   additional supports or services be added to the IEP. (Dkt. No. 18 at 175.)

9       Parents met with District Assistant Superintendent Greg Schwab to discuss their concerns

10  about bullying at school, and the District then began an investigation. (Dkt. Nos. 28 at 12, 21 at

11  80.) The assistant principal's investigation report concluded after speaking with C.S.'s teachers,

12  several classmates, and C.S.'s track and football coaches that he was unable to substantiate any

13  bullying allegations. (Dkt. No. 23 at 136–40.)

14      **B.**      **Summer and Fall 2018**

15      C.S. passed all but two of his tenth-grade courses, which he completed in the summer.

16  (Dkt. Nos. 21 at 88–89, 23 at 145, 30 at 93–94.) His private therapist suggested a transfer to

17  Meadowdale High School ("MHS") for his junior year. (Dkt. Nos. 23 at 114, 30 at 16.) Parents

18  met with Assistant Superintendent Schwab to discuss the transfer, and the District approved it.

19  (Dkt. No. 23 at 148–49.) MHS's principal emailed Parents twice via e-mail to try and set up a

20  meeting. (Dkt. No. 24 at 156.) Instead, on August 26, 2018, Parents informed the District that they

21  were enrolling C.S. at Boulder Creek Academy ("BCA"), a boarding school in Idaho. (Dkt. Nos.

22  34 at 155–56, 29 at 84–85.)

23      Although C.S. was no longer a District student, a few days later, the District sent Parents

24  prior written notice proposing to reevaluate C.S. (Dkt. No. 24 at 158–61.) The District then

25  conducted the reevaluation, gathering input from his teachers, education records, BCA staff, and Dr.

26

1    Beau Riley, a psychologist hired b Parents to conduct a private evaluation.[1] (Dkt. Nos. 138–39, 23 at

2    152.) The team concluded C.S. did not demonstrate the need for an environment as restrictive as

3    BCA, but that the District's intensive learning support program would be appropriate. (Dkt. Nos. 25

4    at 21, 22 at 107–08.) C.S., however, never returned to the District. (Dkt. No. 32 at 196.)

5              **C.    Procedural History**

6              On January 6, 2020, Parents filed a due process hearing request. (Dkt. No. 32 at 191.)

7    They sought declaratory relief that the District denied C.S. a free appropriate public education

8    ("FAPE") as well as reimbursement for C.S.'s placement at BCA and for private evaluations.

9    (Dkt. No. 32 at 195.) The seven-day hearing involved 13 witnesses and numerous exhibits. (*Id.*)

10   C.S. did not participate, but his mother testified. (Dkt. No. 32 at 192.)

11             The ALJ issued 160 findings of fact and 84 conclusions of law. (*See id.*) She found that

12   Parents had not proven that the District denied C.S. a FAPE, so she denied their requested

13   remedies. (*Id.* at 243.)  C.S. and his parents now appeal that decision. (*See* Dkt. No. 1.)

14   **II.    DISCUSSION**

15             **A.    Standard of Review**

16             "Though the parties may call the procedure a 'motion for summary judgment' in order to

17   obtain a calendar date from the district court's case management clerk," when reviewing a motion for

18   summary judgment in an appeal from an IDEA hearing, "the procedure is in substance an appeal

19   from an administrative determination, not a summary judgment." *Capistrano Unified Sch. Dist. v.*

20   *Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). Accordingly, the Court does not apply the typical

21   summary judgment standard, but instead applies a modified *de novo* standard. *Ojai Unified Sch. Dist.*

22   *v. Jackson*, 4 F.3d 1467, 1471–73 (9th Cir. 1993).

23             The Court must read the administrative record, consider any new evidence offered by the

24   parties, and make an independent judgment based on a preponderance of the evidence, giving due

25   weight to the hearing officer's determinations. *Wartenberg*, 59 F.3d at 892. The Court must

26   ――――――――――――――――――

[1] C.S. was out of state at BCA and unavailable for direct assessment. (Dkt. No. 21 at 154.)

ORDER
C21-0390-JCC
PAGE - 4

carefully consider the findings and address the hearing officer's resolution of each material issue. *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996). The Court may then accept or reject the hearing officer's findings in part or as a whole. *Id.* Courts give particular deference to the administrative proceedings where, as here, the administrative decision was careful, impartial, and sensitive to the complexities present. *Ojai*, 4 F.3d at 1472, 1476; *JG v. Douglas County Sch. Dist.*, 552 F.3d 786, 793 (9th Cir.2008). Plaintiffs bear the burden of proof. *See L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009).

In determining whether a state has provided a FAPE, courts ask: (1) has the State complied with the procedures set forth in the IDEA; and (2) is the IEP developed through its procedures reasonably calculated to enable the child to receive educational benefits? *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (9th Cir. 2010). "If these requirements are met, the State has complied with the obligations imposed by Congress[,] and the courts can require no more." *Bd. of Ed. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176 (1982).

### A.    ALJ Decision

Giving due weight to the administrative proceedings, the Court finds that the District did not deny C.S. a FAPE. On appeal, the Plaintiffs argue the ALJ should have found that the District denied C.S. a FAPE by failing to (1) reevaluate C.S. in May 2018, (2) formally document proposed changes for the 2018–2019 school year, and (3) provide appropriate IEPs in March and June of 2018. (*See* Dkt. No. 32.)  Their claims are discussed in turn.

#### 1.    Alleged Failure to Reevaluate in May 2018

Plaintiffs argue the District violated the IDEA by failing to initiate a reevaluation in May 2018.[2] (Dkt. Nos. 32 at 231, 35 at 27.) The IDEA requires districts to reevaluate students' eligibility for services at least once every three years. 20 U.S.C. § 1414(a)(2)(B)(ii); WAC 392-

---

[2] Here, Plaintiffs' argument challenges the assessment revision itself. (Dkt. No. 35 at 11–13, 27, 29–30.) The ALJ concluded that while Plaintiffs challenged the failure to conduct a reevaluation in May 2018, they did not challenge the revision assessment approved by the Student's IEP team on May 31, 2018. (Dkt. No. 32 at 233.) This Court concludes the same.

172A-03015(2)(b). A reevaluation must be conducted sooner if a district determines that the educational or related service needs of the student warrant a reevaluation, or if the child's parent or teacher requests a reevaluation. 20 U.S.C. § 1414(a)(2)(A)(i)–(ii); WAC 392-172A-03015(1).

Here, Parents failed to prove that they requested a reevaluation in May 2018.[3] They do not claim that any of his teachers requested one. A reevaluation would therefore only have been required if the District determined C.S.'s needs so warranted.

There is no evidence that any District staff member felt that a full reevaluation was necessary. Plaintiffs met with the school on May 31, 2018, to discuss the results of the IEP assessment revision and consider amending the IEP to add counseling services. (Dkt. No. 32 at 213.) The school psychologist determined that it would be time to consider doing a full reevaluation in fall 2018 if the additional counseling with the District's behavior specialist was insufficient. (*Id.*) Similarly, C.S.'s special education teacher testified that she did not believe C.S. required any additional goals or services.[4] (Dkt. No. 19 at 115–16.)

Further, Plaintiffs fail to prove District staff *should have* felt reevaluation was necessary. The ALJ found that Plaintiffs' evidence did not establish severe school refusal warranting

---

[3] Parents were aware at the time that no reevaluation had taken place and did not object to a revision taking place instead—indeed they signed a form consenting to the revision. (Dkt. No. 23 at 110.) They assert they simply "signed whatever paperwork" the District gave them and "did not understand how the IEP process worked." (Dkt. No. 35 at 12–13.) But on the assessment revision notice, the box marked "reevaluation" was left blank and instead the box directly below indicating they were initiating "[o]ther: counseling as a related service" is checked. (Dkt. No. 23 at 109.) The June 2018 IEP, drafted May 31, 2018, also indicated that the most recent evaluation date was March 14, 2017, and that the next must occur before March 14, 2020. (*Id.* at 114.) The documentation clearly indicated that an early reevaluation was not being conducted.

[4] Plaintiffs also argue that in rejecting this claim below, the ALJ failed to adequately consider the testimonial evidence of Board-Certified Behavior Analyst Michael Fabrizio. (Dkt. No. 35 at 4–6 (citing Dkt. No. 32 at 198), 8, 15.) The Court disagrees. The ALJ did not entirely set aside his testimony as Plaintiffs suggest, but rather found his testimony was entitled to less weight because (among other things) he had never met C.S., performed any assessments, spoken with his teachers, or observed him in a school setting. (Dkt. No. 32 at 198–99.) She thus assigned more credit to the opinions of those who had done so, such as C.S.'s school psychologist and special education teacher. (*Id.*)

1   additional assessment—C.S. attended partial days as planned most days through the end of the

2   year. (*Id.* at 214.) Plaintiffs do not point to legal error in this conclusion. Similarly, the Court

3   rejects Parents' assertion that the District should have been aware of C.S.'s PTSD symptoms

4   stemming from the airsoft gun incident and reevaluated him on that basis in May 2018. (Dkt. No.

5   35 at 32.) The incident occurred that month. (Dkt. No. 21 at 26.) C.S. initially downplayed its

6   personal impact to the school, and his BCA psychiatrist later testified that "typically there's a

7   latency between the event and the development of PTSD symptoms." (Dkt. Nos. 18 at 59–60, 30

8   at 66.) This suggests that PTSD concerns and symptoms were not reasonably known to the

9   District that spring when it drafted the IEP. The first indication in the record of Parents

10   mentioning PTSD in relation to C.S. occurred on June 13, 2018, and he was not formally

11   diagnosed with PTSD until August 27, 2018. (Dkt. Nos. 23 at 152, 30 at 14.)

12        Based on the evidence, the ALJ did not err by concluding that the District had no duty to

13   reevaluate Student's eligibility for services in May 2018.

14        2.    Alleged Failure to Formally Document Changes to 2018–2019 IEP

15        The IDEA requires school districts to give parents prior written notice whenever they

16   intend to change the identification, evaluation, or educational placement of the parents' child.

17   § 1415(b)(3); WAC 392-172A-05010; *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d

18   1105, 1112 (9th Cir. 2016).

19        Congress placed a great deal of importance on the procedural safeguards in the IDEA,

20   however, if "a procedural violation does not result in a lost educational opportunity for the student,

21   the violation is 'harmless error' because it does not deny the student a FAPE*." R.B., ex rel. F.B. v.*

22   *Napa Valley Unified Sch. Dist.*, 496 F3d 932, 938 (9th Cir. 2007).

23        Parents argue the District failed to document proposed changes in accordance with the

24   IDEA's procedural requirements.[5] (Dkt. No. 35 at 33.)

25   ──────────────
26   [5] The issue presented to the ALJ was whether the District violated the IDEA by failing to formally
   document changes to services "beginning in the fall of the 2018–19 school year." (Dkt. No. 32 at
   193.) Accordingly, the Court will address Plaintiffs' properly exhausted procedural violation claims

1    The ALJ concluded that the District did not give timely notice of an IEP meeting before

2    the start of the 2018–2019 school year, but this procedural violation did not result in a denial of

3    FAPE to C.S. (Dkt. No. 32 at 239.) She reasoned that Plaintiffs were aware of the services the

4    District intended to offer prior to their unilateral placement of C.S. at BCA. (*Id.*) As the District

5    notes, District staff *did* attempt to engage Parents in planning for the upcoming year—they met

6    with parents, obtained an administrative approval for a transfer to MHS, and discussed support

7    services. (*See* Dkt. No. 32 at 147.) But Plaintiffs stopped engaging with District staff, and District

8    staff had no reason to believe they were unaware of any supports being considered. In fact, rather

9    than making changes without parental notice or involvement, here, the changes would have been

10   made at Parents' behest. The failure to provide prior written notice of changes before the start of the

11   school year did not impede Parents' participation rights or lead to a deprivation of an educational

12   benefit and, as such, it was harmless error.

13                    3.    Appropriateness of March 2018 and June 2018 IEPs

14   The appropriateness of an IEP is determined using the "snapshot rule," under which an

15   IEP is judged "not in hindsight, but instead based on the information that was reasonably

16   available to the parties at the time of the IEP." *Dep't of Educ. of Hawaii v. Leo W. ex. Rel.*

17   *Veronica W.*, 226 F. Supp. 3d 1081, 1099 (D. Haw. 2016) (quoting *Baquerizo v. Garden Grove*

18   *Unified Sch. Dist.*, 826 F.3d 1179, 1187 (9th Cir. 2016)).

19   Where a child is fully integrated in the regular classroom, an IEP should be "reasonably

20   calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*,

21   458 U.S. 176, 203–04 (1982). Where a child is not fully integrated into the classroom and not able to

22   advance, it should be "appropriately ambitious in light of his circumstances." *Endrew F. ex rel.*

23   *Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017).

24   _____

25   concerning fall 2018. *See* 20 U.S.C. § 1415(l). The Court also notes the ALJ appropriately found
     below that the District was not required to document the temporary safety supports as all parties
26   understood them to be in place for the remaining weeks of the 2017–2018 school year. (Dkt.
     Nos. 32 at 234, 35 at 16–17.)

1

### a. March 2018 IEP

2        Plaintiffs asserted that the March 2018 IEP failed to provide C.S. with a FAPE by failing to

3    address his social skills, self-advocacy, behavioral skills, and emotional regulation. (Dkt. Nos. 32 at

4    193, 35 at 40.) There is no evidence the District rejected any request from Plaintiffs at the March

5    2018 IEP team meeting, or that the District failed to identify a need in the March 2017 reevaluation.

6        True, the ALJ found that the District failed "to discuss fully the Student's rate of missing

7    assignments and progress, or lack of progress, toward his goal." (Dkt. No. 32 at 230.) But the ALJ

8    concluded Plaintiffs had not proven that "a consequence of that error was the District's failure to

9    address the Student's *social skills, self-advocacy, behavioral skills, and emotional regulation*," the

10   area Parents identified as deficient below. [6] (*Id.* (emphasis added))  Had the team fully discussed

11   the timeliness of C.S.'s assignments at the meeting, resulting discussions would probably have

12   been limited to learning strategies and organizational skills and would thus not have addressed the

13   social/emotional issues Plaintiffs raise.  (*Id.*) This is especially likely where, as here, Plaintiffs

14   participated fully in the meeting and raised no concerns regarding a lack of goals to address

15   social/behavioral skills.

16       Plaintiffs suggest emphasizing their agreement with the IEP improperly shifts the burden of

17   complying with the IDEA off the District and onto Parents. (Dkt. No. 35 at 30.) This argument is

18   unavailing. While the onus is on the District to adequately address student needs through the IEP

19   process, the lack of contemporaneous concern over the IEP's adequacy from *any party* tends to

20   suggest the IEP was appropriate given the information *available at the time*. (Dkt. No. 39 at 38–40.)

21       Plaintiffs have not proved that the March 2018 IEP failed to address the areas named

22   above and, consequently, have not proved that the IEP was inappropriate.

23   //

24   _____

[6] Plaintiffs also note C.S.'s lack of progress toward his organizational goal. (Dkt. No. 35 at 42–
25   44.) But Plaintiffs did not challenge the lack of progress towards that goal—they challenged the
failure to address C.S.'s social skills, advocacy, behavioral skills, and emotional regulation. (*See*
26   Dkt. No. 32 at 193, 230.) As such, that issue is not properly before this Court.

1

                          *b. June 2018 IEP*

2

       Plaintiffs also argue that the June 2018 IEP failed to offer a FAPE because it failed to

3

address (1) C.S.'s social skills, self-advocacy, behavior, and emotional regulation, or (2) bullying

4

and harassment he experienced.[7] (Dkt. Nos. 32 at 193, 35 at 40.)

5

       As Plaintiffs did not challenge the May 31, 2018, assessment revision, the ALJ analyzed

6

the appropriateness of the June 2018 IEP is in context of the assessment revision. (Dkt. No. 32 at

7

233.) The June 2018 IEP continued to provide C.S. with services to support his organizational

8

goal, with the additional support of counseling added in accordance with the assessment revision,

9

which in turn responded to the recent hospitalization. (Dkt. No. 23 112–16.) On an IEP form, the

10

IEP team checked the box to indicate that they had considered "strategies, including positive

11

behavioral interventions, strategies, and supports to address. . . behavior" but that this was "not

12

an area of concern at this time." (*Id.* at 116.) Parents were again involved with the development

13

of the amendment and made no requests at the time for additional services. Plaintiffs offer little

14

to counter this strong evidence that the amendment was based on the information reasonably

15

available to the parties at the time.

16

       Parents also challenge the June 2018 IEP for failure to address bullying concerns. (Dkt.

17

No. 35 at 40.) The evidence supports the ALJ's conclusion that the June 2018 IEP was appropriate

18

without additional anti-bullying measures. (Dkt. No. 32 at 243.) As the ALJ noted, the District

19

was only aware of a few incidences of bullying behavior at the time the IEP was drafted. (Dkt.

20

No. 32 at 243–44.) The school had enacted a temporary safety plan outside of the IEP through

21

the end of that school year. (*Id.*) Had the District obtained more information about continued

22

bullying after June 2018, perhaps it would have been necessary to address this issue in later IEPs.[8]

23

_____

24

[7] Plaintiffs argued below that the June 2018 IEP also failed to provide summer instruction. (Dkt.
No. 32 at 193.) This issue is not raised on appeal. (*See generally* Dkt. No. 35.)

25

[8] Plaintiffs present screenshots from District students' social media accounts as evidence of
"cyberbullying." (*See* Dkt. No. 32 at 223, 242.) Plaintiffs acknowledge the District was likely

26

unaware of this evidence when the IEPs were drafted. (*See, e.g.*, Dkt. No. 40 at 17.) Due to the
nature of the Internet, it is unclear when these pages were accessed by or known to Parents. The

1  But C.S. was removed from the District before the next year and Plaintiffs do not challenge later

2  IEPs. (*See generally* Dkt. No. 35.) Plaintiffs have not met their burden of proof on this issue.

3                    4.    <u>Entitlement to Requested Remedies</u>

4          Because the Court finds that Plaintiffs failed to prove the District denied C.S. a FAPE, it

5  also must find that they are not entitled to their requested relief. *See* 20 U.S.C. § 1412(a)(10)(C)(ii)

6  (Parents are entitled to reimbursement for private tuition where a District "had not made a free

7  appropriate public education available to the child in a timely manner prior to that enrollment");

8  *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1058 (9th Cir. 2012) ("Parents have an equitable

9  right to reimbursement for the cost of providing an appropriate education *when a school district*

10 *has failed to offer a child a FAPE*" (emphasis added)). The Court therefore does not reach the issue

11 of whether BCA was a proper placement. Accordingly, the ALJ's decision to deny all requested

12 remedies is affirmed.

13 **III.    CONCLUSION**

14         For the foregoing reasons, the Court GRANTS summary judgment to Defendant,

15 DENIES it to Plaintiffs, and AFFIRMS the ALJ's order.

16         DATED this 6th day of July 2022.

17

18

19  _____

20  John C. Coughenour
    UNITED STATES DISTRICT JUDGE

21

22

23

24  _____

25  Assistant Principal had not seen this online content and Parents did not raise specific concerns at
    the time. (Dkt. No. 32 at 144–45.) It is not clear C.S. was aware of cyberbullying, or that he was
26  free from bullying at BCA. (*Id.* at 242.)  The Court therefore does not find this evidence persuasive
    in evaluating the appropriateness of the IEPs under the snapshot rule.

ORDER
C21-0390-JCC
PAGE - 11